IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST SAINT LOUIS DIVISION

| | |
|---|---|
| LORIN ASHTON, BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC.,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>SHAWN ORTEZ, KENNETH CLAYTON ELKINS, DOWNRIGHT ENTERTAINMENT, LLC, MISSISSIPPI UNDERGROUND, LLC, JORDAN JULIAN, and JOHN DOES 1-25.<br><br>　　　　　　　Defendants. | Case No. 3:25-cv-02181 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**I.　INTRODUCTION**

Plaintiff LORIN ASHTON, professionally known as "Bassnectar," and his entities BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC. (collectively referred to as "Bassnectar") by counsel, SWANSON, MARTIN & BELL, LLP, for their memorandum in support of their motion for an emergency temporary restraining order and preliminary injunction against SHAWN ORTEZ, CLAY ELKINS, DOWNRIGHT ENTERTAINMENT, MISSISSIPPI UNDERGROUND, JORDAN JULIAN, and JOHN DOES 1-25 (collectively "Defendants").

The Defendants have made numerous social media posts online regarding a New Year's Eve event where Bassnectar is scheduled to perform at Pop's Night Club located at 1403 Mississippi Ave, Sauget, IL 62201 on December 29, 2025-January 1, 2026. The Defendants have made numerous posts online that encouraged other social media users to boycott the event, and

have falsely alleged that Bassnectar is a "sexual predator" and/or "pedophile." As a result of Defendants' actions and their incitement of third parties, as other social media users (at Defendants' encouragement) to post on social media regarding their intention to bomb the venue and otherwise physically harass its patrons during Bassnectar's event.

Bassnectar will be irreparably harmed if Defendants are not immediately ordered to remove these damaging posts and enjoined from making any future threats to Bassnectar's and the public's safety during the pendency of this litigation. By contrast, Defendants will suffer little harm, if any, from such injunctive relief. Considering the likelihood that Bassnectar will succeed on the merits of their claims, the harm to Bassnectar if no injunction is granted, and the balance of equities and public interest – as set forth more fully below – the Court should enjoin further unlawful conduct by Defendants and grant Bassnectar's requested relief.

## II.     FACTUAL BACKGROUND

*Bassnectar's Background and Work*

Mr. Ashton, professionally known by his stage name "Bassnectar," has been a prominent DJ and performer in the electronic dance music community since 1998, touring extensively across the United States and headlining major music festivals. [Dkt 1, ¶38] By the mid-2000s, Bassnectar was performing more than 150 shows per year and by 2014, he was one of the top ten highest grossing touring acts in North America and a regular headliner at major festivals across the country. [Dkt 1, ¶38] Bassnectar's live performances and tours often sold out in minutes, spanning multiple nights and drawing crowds of more than 20,000 attendees. [Dkt 1, ¶38] To date, Bassnectar has released fifteen studio albums, establishing himself as a pioneer of modern electronic music. [Dkt 1, ¶38]

Bassnectar markets his music, recordings, and appearances through social media, including on Twitter, Reddit, Instagram, Facebook, and other platforms. [Dkt 1, ¶39] Through his performances and outreach, Bassnectar's musical endeavor has evolved into a cultural movement, providing community, purpose, and identity to thousands of fans across the country. [Dkt 1, ¶39] His reputation and image are vital to his ability to market himself and maintain his career as an artist in the music industry. [Dkt 1, ¶39]

*Social Media Attacks on Bassnectar*

In or around 2015, social media users who deliberately post inflammatory, offensive, and disruptive content on social media and in social media forums, known as "cyber trolls" began spreading false claims alleging that Bassnectar had engaged in sexual misconduct. [Dkt 1, ¶40] Despite evidence to the contrary, the lies and smear campaign persisted. [Dkt 1, ¶40] Throughout the rampant spread of false allegations, Bassnectar has never been criminally charged for any such conduct, and a civil suit that was filed against him was dismissed with prejudice with no finding of wrongdoing against him. [Dkt 1, ¶¶41-42]

*Competing New Year's Eve Events*

In an effort to spread love, positivity, and reconnect with fans, in the fall of 2025, Bassnectar planned and secured a three night New Year's Eve event titled the "Love Here" event at Pop's Night Club and Concert Venue located at 1403 Mississippi Ave, Sauget, Illinois 62201 (hereafter referred to as the "Love Here Event"). [Dkt 1, ¶18] The Love Here Event is being promoted by a company called StageLive Event Solutions, LLC ("StageLive") which is owned by an individual named Joshua Campbell ("Mr. Campbell"). [Dkt 1, ¶18]

At the same time, promoters Mr. Ortez and Mr. Elkins, employees of MU and its affiliated company DownRight, were promoting their own New Year's Eve show titled "G Jones B2B

3

EProm NYE" at MU in St. Louis, Missouri (hereinafter referred to as "GPROM"), which is only a ten-minute drive away from Bassnectar's Love Here Event. [Dkt 1, ¶17] GPROM, held just across the Mississippi River from the Love Here Event and also featuring artists from the EDM community, is in direct competition with the Love Here Event. [Dkt 1, ¶17]

MU and DownRight saw Bassnectar as a roadblock to the success of their competing GPROM event and launched a coordinated online attack against Bassnectar, designed to incite violence, threaten the safety of Love Here Event attendees, derail the Love Here Event, and divert attention and ticket sales away from Love Here and to GPROM. [Dkt 1, ¶19] Defendants knowingly used false allegations against Bassnectar as a sales tactic to alert potential fans not to support him and attend their GPROM event instead. [Dkt 1, ¶20]

Mr. Ortez, at the direction of and in conspiracy with all Defendants, repeatedly published false and defamatory statements about Bassnectar, calling him a "sexual predator," and "pedophile," in an effort to destroy Bassnectar's reputation and sabotage his ability to perform and conduct business. [Dkt 1, ¶¶21-22] The Defendants further conspired by encouraging individuals to sabotage the Love Here Event by flooding the venue with harassing calls and threatening violence against Bassnectar and attendees of the Love Here Event with "supersoakers full of piss." [Dkt 1-1]

Defendants also published personal and private information concerning the owner of StageLive on Facebook, and encouraged third parties to harass him and his family. [Dkt 1-1] Mr. Campbell subsequently filed for a Stalking No Contact Order against Mr. Ortez on behalf of himself and Bassnectar, which was granted on November 20, 2025. [Dkt 1, ¶27] At the hearing for the Stalking No Contact Order, Mr. Ortez admitted in open court that "the threats against Bassnectar were not real" and that he "just wanted to get the show cancelled." [Dkt 1, ¶27]

4

Bassnectar sent Defendants cease and desist letters demanding that they immediately stop making false and disparaging statements about Bassnectar and remove all existing posts referring to them from their social media platforms. [Dkt 1, ¶¶28, 31] Rather than responding to the cease and desist letter, Mr. Ortez and Mr. Elkins celebrated receipt of the letters in a Facebook post, posting it to social media as a tactic to divert ticket sales and attendance away from the Love Here Event and promote GPROM. [Dkt 1, ¶¶29-30, 32] Defendants coordinated with and inspired third-parties and John Doe defendants to join in their online smear campaign against Bassnectar, posting defamatory statements and making threats of violence towards the Love Here Event. [Dkt 1, 35] For example, an individual Charles Gary ("Mr. Gary"), at the direction of and in coordination with Defendants, falsely reported bomb threats relating to the Love Here Event and made statements online suggesting that Bassnectar should be shot. [Dkt 1, ¶33, 34]

Then in November 2025 Jordan Julian, the owner of MU, decided to add a second night of GPROM (on December 29, 2025) to compete directly with Bassnectar's scheduled shows. [Dkt 1, ¶36] All of these actions followed a coordinated "cancel culture" playbook, wherein Bassnectar was defamed as a "pedophile," an online mob was incited against Bassnectar and his fans, and self-promotional language such as "believe women" was used to justify threats and intimidation. [Dkt 1, ¶37]

***Ongoing Damage to Bassnectar***

As a direct result of Defendants' coordinated attacks, Bassnectar continues to suffer severe reputational harm in both their professional and personal communities due to the false, defamatory, and inflammatory accusations spread online. [Dkt 1, ¶44] Bassnectar has experienced ongoing harassment across social media platforms, including a flood of disparaging, false, and inflammatory comments and coordinated campaigns designed to sabotage their work and brand,

5

and have been subjected continued threats to their physical safety, the safety of their fans, and the general public. [Dkt 1, ¶¶45-46]

Defendants' actions were not limited to online attacks but extended to deliberate interference with Bassnectar's contractual and prospective business relationships surrounding the Love Here Event. [Dkt 1, ¶49] By promoting GPROM as a competing New Year's Eve show located just across the Mississippi River, Defendants intentionally sought to divert ticket sales and attendance away from the Love Here Event. [Dkt 1, ¶50] Bassnectar continues to suffer ongoing financial losses and reputational harm as Defendants' smear campaign and interference with the Love Here Event reverberate through the community, diminishing future opportunities for performances, sponsorships, and collaborations. [Dkt 1, ¶55]

### III. LEGAL STANDARD

A temporary restraining order under Rule 65(b) of the Federal Rules of Civil Procedure is appropriate where, as here, the movant establishes that: (1) its case has a "better than negligible" likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted, which outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

A subsequent preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure is appropriate under the same standard. *International Profit Associates, Inc. v. Paisola*, 461 F.Supp.2d 672, 675-76 (N.D. Ill. 2006) (citing *Long v. Bd. of Educ.*, Dist. 128, 167 F.Supp.2d 988, 990 (N.D. Ill 2001)) (standard for issuing temporary restraining order identical to standard for preliminary injunction). As detailed below, Bassnectar has met the standard for a preliminary injunction, and thus, a temporary restraining order should also issue against Defendants.

IV.     **ARGUMENT**

Bassnectar is entitled to a temporary restraining order to prevent further imminent harm caused by Defendants. This Court should follow the Northern District's decision to grant a TRO in *Svanaco, Inc. v. Brand*, 2022 WL 22894739 (N.D. Ill. Sept. 30, 2022). There, a dispute between commercial website competitors led the defendants to embark in an online terror campaign against the plaintiff. *Id.* at *1. The plaintiff filed a lawsuit for claims of defamation, tortious interference with prospective economic advantage, and civil conspiracy and moved for a temporary restraining order. *Id.* at *1-2. The Northern District granted the motion for TRO ordering the defendants to remove the defamatory statements and enjoining them from re-publishing the defamatory statements at issue. *Id.*

Here, just as in *Svanaco*, Defendants have engaged in a similar online campaign of defamation, intimidation, and interference, falsely branding Bassnectar as a "sexual predator" and inciting threats of violence against Plaintiffs and their fans. Just as in Svanaco, emergency relief is warranted to halt Defendants' unlawful conduct, protect public safety, and prevent irreparable harm. For these reasons and the reasons stated below, this Court should grant Bassnectar's Motion.

   A.   **Bassnectar Has a Likelihood of Success on the Merits for Their Claims.**

To establish a likelihood of success on the merits for purposes of a temporary restraining order, and later for a preliminary injunction, Bassnectar need only demonstrate a "better than negligible" chance of prevailing on one or more of their claims. *Kinney v. International Union of Operating Engineers*, 994 F.2d 1271, 1278 (7th Cir. 1993) (citing *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 307 (7th Cir. 1992)). "Under the 'better than negligible' standard, the threshold is low for establishing likelihood of success." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). The movant must only satisfy this modest

threshold question, not prove its case, nor that it is more likely than not that one side will prevail. *OptionsCity Software, Inc. v. Baumann*, 2015 WL 3855622 at *3 (N.D. Ill. 2015). Moreover, the degree of likelihood of prevailing on the merits that must be presented decreases the more the balance of harms weighs in the movant's favor. *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986). Bassnectar's complaint states causes of action based on defamation, false light, intentional infliction of emotional distress, tortious interference with business relationships, violation of the Deceptive Trade Practices Act, unjust enrichment, and civil conspiracy. With evidence at the outset to support each of Bassnectar's claims, in this regard, Bassnectar certainly has a better than negligible chance of prevailing on each of these claims.

> 1. ***Bassnectar Has a Better Than Negligible Chance of Succeeding on their Defamation, False Light, Intentional Infliction of Emotional Distress, and Unjust Enrichment Claims.***

To establish a claim for defamation under Illinois law, Bassnectar must show: (1) Defendants made false statements about Bassnectar; (2) there was an unprivileged publication of the defamatory statements to a third party by the Defendants; and (3) Bassnectar suffered damages as a result. *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). If the defamatory statements impute that Bassnectar (a) committed a criminal offense or (b) prejudice Bassnectar in their trade, profession, or business, they are considered actionable *per se*. See *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 639 (7th Cir. 2005). To establish a claim for false light under Illinois law, Bassnectar must show they were placed in a false light before the public as a result of the Defendants' actions that was "highly offensive to a reasonable person" and that the Defendants acted with actual malice. *See Raveling v. HarperCollins Publishers Inc.*, 2005 WL 900232, at *3 (7th Cir. 2005). To establish a claim for intentional infliction of emotional distress under Illinois law, Bassnectar must show: (1) Defendants' conduct was extreme and outrageous; (2) Defendants

8

intended to inflict severe emotional distress or knew that there was a high probability that their conduct would inflict severe emotional distress; and (3) Defendants' conduct caused severe emotional distress. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). To establish a claim for unjust enrichment under Illinois law, Bassnectar must show: (1) Defendants unjustly retained a benefit to Bassnectar's detriment, and (2) that Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (1989)).

As alleged in the Complaint, Defendants Mr. Ortez, Mr. Elkins, and DownRight (the "DownRight Defendants"), without privilege or permission, published false statements about Bassnectar to members of the general public and online community calling him a "pedophile" and/or a "predator." Bassnectar has never been convicted of any type of sexual predatory crime nor has any civil judgment ever been entered against him for such behavior. Bassnectar and his businesses BTI and Amorphous have suffered damages, including but not limited to, a drastic drop in ticket sales for their Love Here Event as a direct result of the DownRight Defendants' statements.

Moreover, the DownRight Defendants' statements are actionable *per se* because they accuse Bassnectar of committing a crime and impute the inability of Bassnectar of being able to perform their duties in the entertainment industry. These statements accuse Bassnectar of vile and serial criminal and sexual conduct and further suggest a likelihood of future harm to others. The statements are highly offensive and injurious to Bassnectar's past, current, and future character, reputation, and stature in the community, and by their nature, would be highly offensive to any reasonable person. DownRight Defendants posted these statements with actual malice as they

9

posted these statements with the intention of having Bassnectar's Love Here Event cancelled so that they could re-direct the ticket sales to their own competing event. DownRight Defendants intended to cause Bassnectar emotional distress and/or knew that there was a high probability that their conduct would cause such emotional distress. DownRight and MU have financially benefitted from its publication of false and defamatory statements about Bassnectar and their moral character. DownRight and MU have unjustly retained the benefits flowing from its publication of false and defamatory statements about Bassnectar and their moral character and their retention of these benefits is detrimental to Bassnectar and violates the fundamental principles of justice, equity, and good conscience. Clearly, Bassnectar has a viable, and certainly more than negligible, chance of succeeding on their claims for defamation, false light, intentional infliction of emotional distress, and unjust enrichment.

### 2. *Bassnectar Has a Better Than Negligible Chance of Succeeding on their Tortious Interference with Business Relationships Claim.*

To establish a claim for tortious interference with business relationships under Illinois law, Bassnectar must show: (1) Bassnectar's reasonable expectation of entering into a valid business relationship; (2) Defendants' knowledge of Bassnectar's expectancy; (3) purposeful interference by Defendants that prevent Bassnectar's legitimate expectancy from ripening into a valid business relationship; and (4) damages to Bassnectar resulting from such interference. *See Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999) (quoting *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill.1998).

As alleged in the Complaint, Bassnectar had a reasonable expectations of continuing its valid business relationship for their entertainment services related to the Love Here Event. Defendants obviously knew of these expectations as they posted on social media encouraging people not to attend the Love Here Event. Bassnectar has seen a drastic decrease in ticket sales

10

following Defendants' intentional and unjustified interference in Bassnectar's business. Defendants' tortious interference was intentional and done in bad faith or, at a minimum, with reckless indifference to Bassnectar's rights. Accordingly, Defendants' bad-faith interference has caused Bassnectar irreparable harm, warranting immediate judicial relief.

### 3. *Bassnectar Has a Better Than Negligible Chance of Succeeding on their Deceptive Trade Practices Claim.*

To establish a claim for violation of the Illinois Uniform Deceptive Trade Practices Act under Illinois law, Bassnectar must show that the Defendants in the course of their business disparaged Bassnectar's business by false or misleading representation of fact. 815 ILCS § 510/2(a)(8).

As alleged in the Complaint, Defendants Mr. Elkins, DownRight, MU, and Jordan Julian ("MU Defendants") – who are competitors of Bassnectar in the entertainment industry – took steps to falsely alert the public that Bassnectar's planned event included a performer who poses a danger to the community. Defendants further published about Bassnectar's alleged immoral and dangerous conduct to the entertainment industry and general online community. MU Defendants alerted the public that they should boycott Bassnectar's planned event and instead attend MU Defendants' competing event that was to occur at the same time. MU Defendants used deceptive representations of Bassnectar's character and Bassnectar's business in connection with their own business practices. MU Defendants published these statements knowing and/or hoping they would harm Bassnectar's business, or with reckless disregard for the falsity of said statements and knowing (or should have known) their statements were false, causing great harm to Bassnectar's business and reputation. Therefore, at minimum, Bassnectar has better than negligible chance of succeeding on their Deceptive Trade Practices claim.

4. ***Bassnectar Has a Better Than Negligible Chance of Succeeding on their Civil Conspiracy Claim.***

To establish a claim for civil conspiracy under Illinois law, Bassnectar must show: (a) Defendants agree to accomplish an unlawful purpose or a lawful purpose by unlawful means; and (b) Defendants took overt acts in furtherance of the agreement. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999).

As alleged in the Complaint, Defendants, acting in concert, conspired to publish, disseminate, and amplify false and defamatory statements about Bassnectar, intending to tortiously interfere with Bassnectar's planned event and damage Bassnectar's reputation. Defendants agreed to publish false statements regarding Bassnectar and did so with intent to draw the online community and general public away from Bassnectar's event and redirect the online community and general public to purchase tickets for DownRight and MU's competing event, knowing (or recklessly disregarding) the truth. In furtherance of this conspiracy, Defendants coordinated their publications, repeated and republished defamatory statements, and encouraged widespread distribution of the false claims, resulting in reputational harm, emotional distress, and damage to Bassnectar's personal and professional standing.

Bassnectar alleges a clear injury in the form of actual and continuing damages for all of their claims and a judgment for damages is insufficient to remedy Defendants' past and ongoing transgressions. A temporary restraining order and preliminary injunction must be issued to cause Defendants to remove the defamatory and dangerous posts and enjoin Defendants from re-posting.

B. **Bassnectar Has No Adequate Remedy at Law.**

Bassnectar's claims against Defendants also support the threshold finding that Bassnectar does not have an adequate remedy at law. Defendants began posting about Bassnectar's Love Here Event at least by October 17, 2025, and their defamatory statements interfering with Bassnectar's

Love Here Event proceeding as planned – and threats of violence to the general public – have been continuous and ongoing since then. By allowing Defendants to continue their smear campaign against Bassnectar, Bassnectar's Love Here Event will not be able to go on as planned nor will Bassnectar be able to seek additional business opportunities. A damages award may come too late to save Bassnectar's business from this unfair competition.

Legal remedies may also be inadequate to fully compensate the value conferred to Defendants by retaining the sales that were redirected to them from purchasers who would otherwise have bought tickets to Bassnectar's Love Here Event. The harm extends beyond lost ticket sales, as Defendants' statements have prompted a broader boycott of Bassnectar's business altogether. *Scott Aviation, Inc. v. DuPage Airport Auth.*, 393 F.Supp.2d 638, 649 (N.D. Ill. 2005) ("Unjust enrichment is an equitable claim, intended, as are all equitable claims, to ensure fairness and justice and to supplement legal remedies"). That Bassnectar prays for actual damages therefore does not render injunctive relief unnecessary. *See Roland*, 749 F.2d at 386. While not wholly ineffectual, awarding money damages in this case will be seriously deficient as a remedy for the harm suffered. *See id*.

### C. Bassnectar Will Be Irreparably Harmed.

The *Svanaco* Court held that injunctive relief was warranted because the defendants' defamatory statements caused harm to the plaintiff's reputation and goodwill that could not be "adequately be measured or compensated by monetary damages." *Svanaco, Inc.*, 2022 WL 22894739 at *3. Here, Bassnectar will be similarly irreparably harmed if injunctive relief is not entered. Irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland*, 749 F.2d at 386. Bassnectar's former and would-be supporters will not only not attend the Love Here Event because of Defendants' posts, but Bassnectar will also lose them

as consumers of Bassnectar's music in that they will no longer stream his music, attend events where he is performing, or purchase his merchandise. The effects of the damages against Bassnectar will be impossible to calculate and therefore Bassnectar will be irreparably harmed. *See e.g. PepsiCo, Inc. v. Redmond*, 1996 WL 3965 at *29 (N.D. Ill. 1996)("An injury is 'irreparable' in these cases because it cannot be remedied through the payment of money damages and, indeed, it is often difficult (if not impossible) to calculate the true extent of the loss."); *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir. 1984) ("irreparable harm ... means ... plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial"); *Cross Wood Products, Inc. v. Suter*, 422 N.E.2d 953, 957 (Ill. 1st Dist. 1981) (holding that loss of competitive position was not readily subject to measurement by any certain pecuniary standard and this no legal remedy would be adequate to compensate for that loss); *Prentice Medical Corp. v. Todd*, 495 N.E.2d 1044, 1051 (1st Dist. Ill. 1986) (finding that irreparable injury denotes transgressions of a continuous nature resulting in a loss of competition position).

Defendants' defamatory posts designed to defame, emotionally scar, and impinge Bassnectar's ability to do business is likely to result in an intangible loss of his reputation in the entertainment industry that he has developed for over two decades. Because Defendants' transgressions are alleged to be ongoing, Bassnectar remains subject to future irreparable harm in the absence of a preliminary injunction. Ultimately, a preliminary injunction is "the only remedy adequate to curtail the irreparable harm" following the actual or threatened loss of important business interests. *PepsiCo, Inc.*, 1996 WL 3965 at *30.

### D. **The Balance of Hardships Overwhelmingly Favors Bassnectar.**

The fourth factor – balance of hardships – involves a "sliding scale" analysis whereby the greater the movant's likelihood of success on the merits, the less strong a showing the movant

must make that the balancing of harms weighs in its favor. *Promatek Indus. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). The *Svanaco* Court found the scale to slide in the plaintiff's favor since the Court could not discern *any* harm that the defendant would suffer from having to permanently cease his "dishonest and harmful" attacks against the plaintiff. *Svanaco, Inc.*, 2022 WL 22894739 at *3.

Similarly, here, the scale slides overwhelmingly in Bassnectar's favor. For the entry of a temporary restraining order, and later for a preliminary injunction, Bassnectar must only demonstrate a "better than negligible" chance on one of its claims. *Kinney*, 994 F.2d at 1278. Each of Bassnectar's claims are strong enough to reduce the burden to show hardship. *See* § IV(A)(1)-(7) *supra*. As stated above, Defendants' smear campaign against Bassnectar has been continuous and ongoing, and thus the balance of hardships further weighs in Bassnectar's favor.

Independent of the strength of Bassnectar's claims, the potential hardship to Defendants is far from compelling. Defendants' removal of the defamatory, inflammatory, and threatening posts regarding Bassnectar will not thwart Defendants' Event from going on as planned and would in no way cause any undue harm to Defendants' business. *See, e.g. Mintel Int'l Group, Ltd. v. Neergheen*, 2008 WL 2782818 at *6 (N.D. Ill. 2008) (the Northern District of Illinois granted a TRO prohibiting the defendant from using materials "he should not have taken in the first place," holding that "[t]herefore, any harm that he may suffer for the brief duration of the TRO would be in large part a consequences of his own conduct"). Here, Bassnectar is not asking this Court to stop any aspect of Defendants' ordinary business. Rather, Bassnectar asks only that Defendants remove (and promise not to re-post) the defamatory, inflammatory, and threatening statements they made regarding Bassnectar, which they should have never posted in the first place. This factor favors Bassnectar.

15

### E. A Temporary Restraining Order is in the Public's Interest.

Finally, the *Svanaco* Court found the entry of an injunction in that case served the public interest by preventing potential customers of the plaintiff's "from being confused and misled by false information" about him. *Svanaco, Inc.*, 2022 WL 22894739 at *3. The same analysis should apply here in that the public interest is best served if potential fans and ticket-buyers of Bassnectar's are not misled by Defendants' false and inflammatory statements about Bassnectar.

Moreover, injunctive relief is favored to further the public's "significant interest in … preventing violations of statutes." *Neergheen*, 2008 WL 2782818 at *6. Here, Bassnectar has alleged a violation of the Illinois Deceptive Trade Practice Act. As such, the public interest will be served by entering a temporary restraining order preventing further violations of Illinois law.

Finally, it is without question that the public interest is served by removing physical threats of violence aimed at public places. *See, e.g. Bevis v. City of Naperville, Illinois*, 657 F.Supp.3d 1052, 1077 (N.D. Ill. Feb. 17, 2023) ("The protection of public safety is…unmistakably a 'public interest'"). The public interest will be served by entering a temporary restraining order preventing further threats to the public.

### V. CONCLUSION

Bassnectar will be irreparably harmed if Defendants' defamatory and threatening posts are allowed to continue to be published and a temporary restraining order must be entered.

WHEREFORE, Plaintiffs, LORIN ASHTON, BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC., respectfully request the Court:

1) Enter a temporary restraining order and preliminary injunction requiring Defendants SEAN ORTEZ, KENNETH CLAYTON ELKINS, DOWNRIGHT ENTERTAINMENT, LLC, JORDAN JULIAN, AND MISSISSIPPI

16

UNDERGROUND LLC to delete, remove, and/or destroy all public posts regarding Plaintiffs, LORIN ASHTON, BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC.'s New Year's Eve Event scheduled to occur at Pop's Night Club located at 1403 Mississippi Ave, Sauget, IL 62201 on December 29-31, 2025;

2) Enter a temporary restraining order and preliminary injunction enjoining Defendants SEAN ORTEZ, KENNETH CLAYTON ELKINS, DOWNRIGHT ENTERTAINMENT, LLC, JORDAN JULIAN, AND MISSISSIPPI UNDERGROUND LLC and their agents, employees, and affiliates from re-publishing the removed statements about Plaintiffs LORIN ASHTON, BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC. during the pendency of this litigation; and

3) For such other and further relief as the Court may deem just and proper, including Plaintiffs' attorneys' fees and costs herein incurred and expended.

Respectfully Submitted,

**LORIN ASHTON, BASSNECTAR TOURING, INC., and AMORPHOUS MUSIC, INC.**

Dated: December 12, 2025

By:/s/ *Nicole O'Toole Peterson*
Jeffrey S. Becker (ARDC #6282492)
Nicole O'Toole Peterson (ARDC #6330227)
Olivia E. Duggins (ARDC #6349003)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash Avenue, Suite 3300
Chicago, Illinois 60611
Phone: (312) 321-9100
jbecker@smbtrials.com
npeterson@smbtrials.com
oduggins@smbtrials.com